**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DEUTSCHE TELEKOM AG,<br><br>Petitioner,<br><br>v.<br><br>REPUBLIC OF INDIA,<br><br>Respondent. | ) | Civil Case No. 21-1070 (RJL) |

**MEMORANDUM OPINION**
(September 30th, 2026) [Dkt. #60]

This action arises from an international investment arbitration between petitioner Deutsche Telekom AG ("DT") and the Republic of India ("India"). DT seeks recognition and confirmation of an arbitral award entered in its favor. *See* Pet. to Recognize & Confirm Foreign Arbitral Award ("Pet.") [Dkt. #1]. India raises several threshold objections to recognition and invokes Article V of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"). *See* Resp't's Mot. to Deny Pet. to Recognize & Confirm Foreign Arbitral Award ("Resp't's Mot.") [Dkt. #60]. Courts in Switzerland, Germany, and Singapore have considered, and rejected, many of the same issues India advances here, opting to leave the award undisturbed. Upon consideration of the entire record and applicable law, I join those courts in finding that India's objections and defenses lack merit. I therefore **DENY** India's motion and **CONFIRM** the award.

## BACKGROUND

### I. Dispute and Initial Arbitration

This case arises from a dispute between Devas Multimedia Private Limited ("Devas") and Antrix Corporation Limited ("Antrix"), an Indian state-owned entity.[1] Pet. ¶¶ 3, 16. Antrix agreed to lease S-band electromagnetic spectrum on two satellites to Devas in January 2005 ("Devas-Antrix Agreement"). *Id.* ¶ 16. In 2008, DT first invested in Devas through its wholly owned Singaporean subsidiary, Deutsche Telekom Asia Pte. Ltd. ("DT Asia"). *Id.* ¶ 17. In February 2011, however, Antrix terminated the agreement, invoking the *force majeure* clause of the Devas-Antrix Agreement and concluding that India's national security needs required the Government to preserve the spectrum it originally planned to lease to Devas. *Id.* ¶ 24. Devas contested Antrix's termination as unlawful, observing that "Antrix could not rely on a self-induced *force majeure*." *Id.* ¶ 26.

Under Article 9(2) of the Germany-India bilateral investment treaty, disputes between investors and the Contracting State "may be referred to conciliation in accordance with the United Nations Commission on International Trade Law Rules on Conciliation, 1980, if both parties agree." Ex. B to Pet., Agreement Between Fed. Republic of Germany & Republic of India for Promotion and Prot. of Invs. ("BIT") [Dkt. #1-5]. Pursuant to this BIT, on September 2, 2013, DT, as the parent company of DT Asia, submitted a Notice of Arbitration against India. *See* Ex. C to Pet., Notice of Arbitration [Dkt. #1-6]. The

[1] The relevant facts are set forth in greater detail in this Court's prior decision. *See Deutsche Telekom AG v. Republic of India*, 2024 WL 1299344, at *1–2 (D.D.C. Mar. 27, 2024). The following section provides the background most relevant to the issues presently before the Court.

arbitration was seated in Geneva, Switzerland, and was administered through the Permanent Court of Arbitration. *See* P. & A. in Supp. of Resp't's Mot. to Deny Petition to Recognize & Confirm Foreign Arbitral Award ("Resp't's Mem.") [Dkt. #60-1] at 6–7. India contested the Tribunal's jurisdiction, noting that DT did not qualify as an "investor" under the BIT and DT's activities did not constitute an "investment." *Id.* at 7. India also raised substantive defenses, including that DT's claims were precluded by Article 12 of the BIT's "essential security interests" provision. *Id.*

In 2017, the Arbitration Tribunal ("the Tribunal") rejected India's objections and found that India's annulment of the contract violated the BIT. *See* Ex. D to Pet., *Deutsche Telekom AG v. Republic of India*, PCA Case No. 2014-10, Interim Award (Dec. 13, 2017) ("Interim Award") [Dkt. #1-7]. India moved to set aside the Interim Award, but the Swiss Federal Supreme Court ("SFSC") found the Tribunal had jurisdiction under the BIT and had fairly conducted the proceedings. *See* Ex. E to Pet., Tribunal fédéral [TF] Dec. 11, 2018, 4A_65/2018 ("First Swiss Court Decision") [Dkt. #1-8]. The Tribunal issued its final decision on May 27, 2020, awarding DT approximately $132 million. *See* Ex. A to Pet., *Deutsche Telekom AG v. The Republic of India*, PCA Case No. 2014-10, Final Award (May 27, 2020) ("Final Award") [Dkt. #1-4].

## II. Procedural History

On April 19, 2021, DT filed a petition seeking recognition and confirmation of the Final Award in this Court. *See* Pet. India moved to dismiss the petition, arguing that the Court lacked subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604, and that dismissal was warranted under the doctrine of *forum*

*non conveniens*. *See* Mot. to Dismiss [Dkt. #11].

India then sought a stay while it pursued proceedings in Switzerland to revise both the Interim Award and Final Award. *See* Mot. to Stay [Dkt. #18]. India claimed that new evidence showed fraud in the formation of the Devas-Antrix Agreement. Indeed, the Supreme Court of India found that Devas had been formed "for a fraudulent and unlawful purpose," and that "the affairs of the company were conducted in a fraudulent manner." P. & A. in Supp. of Mot. to Stay [Dkt. #18-1] at 4. I granted the stay, *see* Min. Order (July 25, 2022), and then lifted it when the SFSC rejected India's challenge to the Final Award on March 8, 2023, *see* Ex. A to Notice of Foreign Jud. Decisions, TF Mar. 8, 2023, 4A_184/2022 ("Second Swiss Court Decision") [Dkt. #28-1];[2] Min. Order (Apr. 14, 2023).

On March 27, 2024, I denied India's motion to dismiss and granted DT's petition to confirm the Final Award. *See Deutsche Telekom AG v. Republic of India*, 2024 WL 1299344, at *5 (D.D.C. Mar. 27, 2024). India appealed, and on October 3, 2025, our Circuit affirmed this Court's denial of India's motion to dismiss, but remanded the case to consider India's substantive defenses under the Convention. *Deutsche Telekom, A.G. v. Republic of India*, 155 F.4th 694, 704 (D.C. Cir. 2025).

India now presents its defenses to recognition under Article V of the New York Convention. *See* Resp't's Mot. DT filed a timely response, *see* [Corrected] P. & A. in

[2] Two other foreign courts have since confirmed DT's arbitral award. In Germany, on January 26, 2023, the Berlin Kammergericht, the highest state court of Berlin, granted DT's application to enforce the Final Award. *See* Ex. B to Notice of Foreign Jud. Decisions, Kammergericht [KG] Jan. 26, 2023 No. 12 Sch 7/21 ("Berlin Court Decision") [Dkt. #28-2]. In Singapore, the Singapore International Commercial Court rejected India's application to set aside an order granting DT leave to enforce the Final Award. *See* Ex. A to Pet'r's Suppl. Br. in Response to May 24, 2023 Min. Order, *Deutsche Telekom AG v. Republic of India*, [2023] SGHC(I) 7 (Sing. Int. Com. Ct.) ("SICC Decision") [Dkt. #32-2].

Opp'n to Resp't's Mot to Deny Pet. to Recognize & Confirm Foreign Arbitral Award ("Pet'r's Opp'n") [Dkt. #70-1], India replied, *see* Reply in Supp. of Resp't's Mot. to Deny Pet. to Recognize & Confirm Foreign Arbitral Award ("Resp't's Reply") [Dkt. #65], and the motion is now ripe for review.

## LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), a district court "shall confirm the [arbitral] award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention." 9 U.S.C. § 207. Acknowledging the "emphatic federal policy in favor of arbitral dispute resolution," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985), "the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards," *Belize Soc. Dev Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012). Courts may only refuse to enforce the award, "on the grounds explicitly set forth in Article V of the Convention." *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 935 (D.C. Cir. 2007); *see also Argentine Rep. v. Nat'l Grid Plc*, 637 F.3d 365, 369 (D.C. Cir. 2011) ("Confirmation proceedings under the Convention are summary in nature."). "The party resisting confirmation bears a heavy burden of establishing that one of the grounds for denying confirmation in Article V applies." *Pao Tatneft v. Ukraine*, 2020 WL 4933621, at *4 (D.D.C. Aug. 24, 2020).

## ANALYSIS

### I. Subject Matter Jurisdiction

I first address India's contention that this Court lacks subject matter jurisdiction

because India is immune from suit under the FSIA. *See* Resp't's Mem. at 13. DT, in turn, claims that jurisdiction is proper because the arbitration exception to FSIA's immunity applies in this case.[3] Pet'r's Opp'n at 5. I agree with DT.

"In civil cases, a foreign state is presumptively immune from the jurisdiction of United States courts, and that immunity is preserved unless one of the FSIA's exceptions to sovereign immunity applies." *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 775 (D.C. Cir. 2022) (internal citations omitted). The FSIA's "arbitration exception" removes foreign sovereign immunity when a petitioner can show, "(1) an arbitration agreement, (2) an arbitral award, and (3) a treaty potentially governing confirmation." *Deutsche Telekom, A.G.*, 155 F.4th at 700. DT satisfied those three requirements by identifying the arbitration clause in the Germany-India BIT, the Swiss arbitral Final Award, and the New York Convention. *Id.* "This easily satisfied its burden of production regarding the arbitration exception." *Id.*

**a. Commercial Reservation**

India now maintains that the third element of the arbitration exception, that there be a "treaty potentially governing confirmation," is not satisfied. Resp't's Mem. at 13. Specifically, India claims the New York Convention does not cover this award because India reserved the Convention for disputes that India regards as "commercial," and this investment treaty dispute is not "commercial" under Indian law. *Id.* at 14–18. I disagree

[3] DT separately claims that the "waiver exception" to FSIA immunity applies. *See* Pet'r's Opp'n at 12. Because I find that the arbitration exception independently supplies subject matter jurisdiction, I do not need to decide whether India separately waived sovereign immunity under the waiver exception.

with this contention for several reasons.

First and foremost, DT seeks confirmation of the award in the United States under Chapter 2 of the FAA. *See* Pet. ¶ 1. The relevant question is therefore whether the Award falls under the Convention in this U.S. proceeding, not whether an Indian court would be required to enforce it under Indian law. Under the FAA, an award falls under the Convention when it arises from a legal relationship "which is considered as commercial," 9 U.S.C. § 202, and the United States' own commercial reservation is reflected in that statutory standard. India's commercial reservation, by contrast, provides that India will apply the Convention only to relationships considered "commercial" under Indian law; it does not require courts in other states to displace their own implementing law and apply India's domestic commerciality standard. Nor does Article I(3) of the Convention establish the bilateral rule India proposes, namely that an award against India may be enforced in the United States only if the underlying relationship is deemed "commercial" under both U.S. and Indian law. *See* Resp't's Mem. at 15. I therefore look to U.S. law in determining whether the award arises from a commercial legal relationship.

Under U.S. law, the relationship at issue here is plainly "commercial." Our Circuit has held the term "commercial" has a "broad compass" in international arbitration and requires only that the matter or relationship "affect[s] commerce." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 104 (D.C. Cir. 2015). Treaty-based investment disputes satisfy that standard when they arise from commercial investments, even if the dispute involves some sovereign regulatory or governmental actions. *See, e.g., Stabil LLC v. Russian Fed'n*, 167 F.4th 506, 525–26 (D.C. Cir. 2026) (finding a relationship to be

"commercial" notwithstanding Russia's characterization of the dispute as a "geopolitical" issue).

Here, DT invested in Devas, a private company formed to develop satellite-enabled broadband wireless and telecommunications services. *See* Pet'r's Opp'n at 10. The project contemplated both the commercial use of satellite spectrum capacity under an agreement with Antrix and the provision of "broadband services for the Indian market." *Id.* Our Circuit has explicitly found that telecommunications services have an "obvious connection to commerce," and are a "crucial segment of the economy." *See Belize Soc. Dev. Ltd.*, 794 F.3d at 104. DT's relationship with India, through its investment in the Devas-Antrix Agreement, was therefore clearly commercial in nature.[4]

## II. Article V of the New York Convention

"On the merits, courts 'may refuse to enforce the award only on the grounds explicitly set forth' in the Convention." *Sigma Constructores, S.A. v. Republic of Guatemala*, 2026 WL 369602, at *5 (D.D.C. Feb. 10, 2026) (quoting *TermoRio*, 487 F.3d at 935). Here, India claims confirmation should be denied under three Convention grounds: (1) Article V(1)(c), because the arbitration exceeded the scope of India's offer to arbitrate; (2) Article V(1)(b), because India was denied the opportunity to present its case; and (3) Article V(2)(b), because the award is contrary to the public policy of the United States.

[4] Finally, India's argument demands too much at the jurisdictional stage. *See Foresight Fund Managers Ltd. v. Kingdom of Spain*, 2026 WL 2908159, at *11 (D.D.C. Sept. 28, 2026) ("For jurisdictional purposes, this court need only find that Petitioners' awards may 'potentially' be governed by the New York Convention."). The FSIA removes immunity where an action seeks to confirm an award that "is or *may* be governed by a treaty" on arbitral awards. 28 U.S.C. § 1605(a)(6)(B) (emphasis added). The Final Award was rendered in Switzerland, a Convention State, and DT seeks recognition under the FAA's provisions implementing the Convention. Those facts establish, at minimum, that the award "may be" governed by the Convention.

Unfortunately for the respondent, India, I find each argument to be unavailing.

**a. Article V(1)(c): The Scope of India's Offer to Arbitrate**

India contends that the Tribunal addressed a dispute beyond the scope of India's "standing offer to arbitrate under the BIT," and that the petition should therefore be denied under Article V(1)(c) of the Convention. Resp't's Mem. at 22. India advances four theories: (1) DT lacked a qualifying "investment" because its activities were only "pre-investment activities," *see id.* at 23–27; (2) DT allegedly was not a protected investor because its interest in Devas was "indirect" and held through a Singaporean subsidiary, *id.* at 28–31; (3) Article 12's "essential security interests" provision excluded the dispute from arbitration, *id.* at 31–33; and (4) DT's investment allegedly was unlawful under Indian law, *id.* at 33–37. None establishes a sufficient ground for denial under Article V(1)(c).

**i. Protected "Investment"**

India first argues that "DT's claim falls outside the scope of India's consent to arbitrate under the BIT because DT neither made any 'investments' in India nor qualified as an 'investor,' as those terms are defined in the BIT." Resp't's Mem. at 23. However, Article 1(b) of the BIT broadly defines "investment" to include "every kind of asset invested in accordance with the national laws of the Contracting Party." BIT art. 1(b). The provision's nonexclusive list expressly includes "shares in, and stock and debentures of, a company and any other forms of such interests in a company." BIT art. 1(b)(ii). I therefore agree with the several courts who have already addressed this question in finding that DT had a protected "investment" as that term is defined in the BIT. *See, e.g.*, SICC Decision ¶ 97 (finding that after DT invested in shares in Devas through DT Asia, "[t]here was

nothing more that needed to be done to qualify as an 'investment' within the meaning of Article 1(b) of the BIT.").

In attempting to avoid this outcome, India refers to Article 3(1) of the BIT, which provides that each Contracting Party shall "admit investments in its territory in accordance with its law and policy," and Article 7(c) of the Devas-Antrix Agreement, which allows Antrix to terminate the Agreement if Antrix was "unable to obtain the necessary frequency and orbital slot coordinate required for operating" the satellites. Resp't's Mem. at 24–25. India reads these provisions together as effectively withholding BIT protection unless the host State has approved the authorizations needed for the investee's contemplated operations. *Id.* at 26. But that reading conflates the Treaty's plain definition of a covered "investment" with the regulatory approvals necessary to operate a particular business. Article 1(b)(ii) defines "investment" to expressly include "shares in, and stock and debentures of, a company." BIT. art. 1(b)(ii). Article 3(1), by contrast, addresses each Contracting Party's obligation to admit investments in accordance with its law and policy; it does not provide that a covered equity interest disappears as an investment if the host State later withholds an operational license or prevents the underlying project from proceeding.

**ii. "Indirect" Investor**

India next contends that DT is an "indirect investor" because DT invested in Devas through DT Asia, its Singapore subsidiary, and India did not offer to arbitrate disputes with "indirect investors." Resp't's Mem. at 28–31. In India's view, because DT did not *itself* hold shares in Devas, DT could not accept India's offer to arbitrate under the BIT. *Id.* at

28. Furthermore, India argues that the absence of the phrase "directly or indirectly" in the BIT itself is meaningful because India and Germany each used that phrase expressly in other investment treaties when they intended to extend BIT protection to indirect investments. *Id.* at 28–29.

However, I find the analysis of both the Tribunal and the Swiss Federal Supreme Court persuasive in noting that this BIT contains no direct ownership restriction. *See* Interim Award ¶ 147 (finding "the fact that India and Germany chose not to elaborate on the directness of investments in the BIT does not mean that they intended to exclude indirect investments."); First Swiss Court Decision, ¶ 3.2.1.2.5., at 18 (noting "[t]he illustrative list of investments to be taken into account is broad and nothing in the text of the BIT gives the impression that the contracting parties sought to restrict in any way the scope of the notion of investment..."). In reviewing Article 1(b), which defines "investment" and Article 1(c), which defines "investor," *de novo*, I find that neither provision requires that a German investor hold the relevant Indian asset in its own name rather than through a wholly owned subsidiary.

India's comparative treaty analysis does not overcome the plain text of the BIT. *See* Resp't's Mem. at 28–29. The fact that other treaties identify certain investments as made "directly or indirectly" may show that the parties to those treaties elected to remove doubt in those distinct instruments. *See* Interim Award ¶ 147 (noting simply that "[s]ome treaties are more detailed than others."). It does not, however, establish the converse proposition that silence in this BIT affirmatively excludes indirect investment. *See* First Swiss Court Decision, ¶ 3.2.1.2.4., at 16–17. The relevant question remains what the Germany-India

BIT states, and it plainly covers every kind of qualifying asset and does not limit coverage to direct ownership. I therefore hold, on the Treaty's text, that DT's use of a subsidiary to invest in Devas does not place DT outside the class of investors whom the BIT protects.

**iii. "Essential Security" Clause**

India next invokes Article 12 of the BIT, which states that "[n]othing in this Agreement shall prevent either Contracting Party from applying prohibitions or restrictions to the extent necessary for the protection of its essential security interests." Resp't's Mem. at 31. India contends that DT's claims are excluded from the Tribunal's jurisdiction because the challenged measures concerned "essential security interests," specifically the country's need to reserve S-band capacity for "strategic military and critical societal applications." *Id.* at 33. India relies particularly on the Tribunal's observation that "successful invocation of Article 12 entails [the far-reaching consequence] of entirely disapplying the [BIT]," which it reads to be a jurisdictional bar to arbitration. Resp't's Reply at 13.

That argument fails because Article 12 establishes a substantive defense, not a limitation on the scope of Article 9's arbitration agreement. *See, e.g., Anatolie Stati v. Republic of Kazakhstan*, 302 F. Supp. 3d 187, 208 (D.D.C. 2018) (emphasizing that a respondent's, "invitation to re-try the merits of the arbitration undermines the very purpose of the New York Convention."). Article 9 authorizes arbitration of disputes between India and a qualifying German investor "in connection with an investment." BIT art. 9(1). Whether Article 12 excused India's conduct was subsequently a merits question within the Tribunal's authority to decide.

**iv. Alleged Fraudulent and Illegal Activity**

India lastly contends that DT's investment was "unlawful under Indian law," and therefore falls outside Article 9 of the BIT. Resp't's Mem. at 33. India relies on the National Company Law Tribunal's ("NCLT") proceedings that ultimately dissolved Devas, and on the Supreme Court of India's affirmance of the dissolution. *Id.* at 34. India asserts: (1) that the Indian judgments establish fraud and illegality in the operation of Devas and the formation of the Devas-Antrix Agreement; (2) that they bind DT under Indian-law principles of *res judicata*, and that principles of international comity require that I accord the judgments substantial effect. *Id.* at 33–37.

India is correct that a treaty requirement that an investment be made in accordance with host State law can bear on the scope of consent to arbitrate. *See Tatneft v. Ukraine*, 21 F.4th 829, 835 (D.C. Cir. 2021) (finding a party's consent to arbitrate could be "vitiated" if its interest was acquired illegally). The relevant inquiry, however, is whether *DT's* investment, namely its acquisition of Devas shares, was unlawful and therefore placed it outside the BIT's offer of arbitration. *See* Interim Award ¶ 119 (noting that "none of the allegations contained in the [Central Bureau of Investigation] Charge Sheet relate to actions or conduct of DT."). Findings concerning wrongdoing by Devas, its founders, particular officers, or government officials do not establish that DT's investment was unlawful or that DT knowingly participated in the alleged fraud. *See* SICC Decision ¶ 87 ("It is telling in this respect that India has never brought charges against DT.").

I need not decide the full preclusive effect of the Indian judgments. Even assuming that the Supreme Court of India's judgment is final, entitled to recognition, and properly

considered as substantial evidence of the facts it determined, India has not identified a finding from that judgment that resolves the issue before this Court: that DT, when it acquired its interest in Devas, knowingly participated in fraud, violated a legal requirement governing its investment, or otherwise made an investment that was illegal at inception.

I find the Singapore International Commercial Court's *de novo* analysis on this issue to be particularly persuasive. *See* SICC Decision ¶¶ 74–93. That Court found, "it would not be appropriate for us to deduce, from the solitary fact that DT had conducted due diligence on Devas, that DT would have become aware of any fraud being perpetrated by Devas and its original investors on Antrix and India." *Id.* ¶ 79. Ultimately, India has not established that DT's investment was unlawful in a manner that "vitiated" India's consent to arbitration, and so I find no Article V(1)(c) ground for denying confirmation.

**b. Article V(1)(b): India's Opportunity to Present its Case**

India separately invokes Article V(1)(b) of the New York Convention, which permits refusal of enforcement where a party "was otherwise unable to present his case." Resp't's Mem. at 37. India argues that the Tribunal denied it a meaningful opportunity to advance its fraud defense by declining to admit the August 2016 CBI charge sheet and refusing to stay the arbitration pending further Indian investigations and proceedings. *Id.*

Courts evaluate Article V(1)(b) claims "under standards of American law, which require an arbitrator to provide a fundamentally fair hearing, defined as one that meets the minimal requirements of fairness—adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator." *Air Canada v. Bolivarian Republic of Venezuela*, 2026 WL 2364365, at *7 (D.D.C. Aug. 14, 2026). Here, each of those requirements is met.

India fully participated in the arbitration, raised its illegality theory to the Tribunal, and the arbitrator concluded that India had not shown how, "as a result of the CBI's Charge Sheet, *DT's* investment (made through the acquisition of shares in Devas) would have been contrary to Indian law." Interim Award ¶ 119.

**c. Article V(2)(b): Public Policy Considerations**

India next invokes Article V(2)(b), arguing that confirmation "would violate longstanding U.S. public policy against fraud and illegal contracts," because Indian courts found that Devas and the Devas-Antrix agreement were "infected with the poison of fraud." Resp't's Mem. at 40, 42. The Court gives due consideration to the Indian proceedings, including the Supreme Court of India's judgment, but India has not shown that confirming this Award would reward fraud or illegality attributable to DT. I therefore find that Article V(2)(b) does not bar confirmation of the award.

"Courts in this circuit have repeatedly held that courts should rely on the public policy exception only in clear-cut cases where enforcement would violate the forum state's most basic notions of morality and justice." *Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*, 314 F. Supp. 3d 95, 109 (D.D.C. 2018) (cleaned up). The exception is narrowly construed and only available where an award, "tends clearly to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property." *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016).

Here, India does not qualify for that exception because it has not established that DT made its investment unlawfully or seeks to recover the fruits of wrongdoing properly

attributable to DT. India identifies no criminal charge, conviction, or judicial finding that *DT* committed fraud; nor do the later-developed materials establish that enforcement would allow DT to profit from its own wrongdoing. At most, those materials support allegations against Devas and others involved in the underlying project, which is insufficient to bar confirmation of an award for DT under Article V(2)(b).

## III. Res Judicata

Finally, DT contends that *res judicata* and principles of international comity bar India from relitigating issues raised in the Swiss, German, and Singaporean proceedings. *See* Pet'r's Opp'n at 36. India responds that the New York Convention permits independent enforcement proceedings in multiple jurisdictions, that each enforcing court must apply Article V for itself, and that the foreign decisions do not satisfy the requirements for claim or issue preclusion. *See* Resp't's Reply at 18.

I need not resolve that broader dispute. India's objections fail on the merits under this Court's own independent review. The foreign decisions nonetheless provide persuasive support: each considered substantially overlapping challenges concerning the Tribunal's jurisdiction, DT's investment, and the alleged fraud and illegality, and each reinforces the conclusion that India has not established a ground for refusal under Articles V(1)(b), V(1)(c), or V(2)(b). I therefore consider those decisions as relevant legal and factual context, rather than binding judgments.

## CONCLUSION

For the foregoing reasons, India's Motion to Deny Petition [Dkt. #60] is **DENIED** and the arbitral award is **CONFIRMED**. An order consistent with this Memorandum Opinion will issue on this date.

RICHARD J. LEON
United States District Judge